**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles GOLDFARB, James Tamer, James Abraham, Edward Monazym, and The Aladdin Hotel Corporation, Defendants-Appellants.**

**Nos. 79–5255, 79–5317, 79–5318, 79–5319 and 79–5320.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1980.

Decided March 5, 1981.

As Amended June 1, 1981.

N. C. Deday LaRene, Detroit, Mich., for defendant-appellant in No. 79–5255.

Clyde D. Pritchard, Detroit, Mich., for defendant-appellant in No. 79–5317.

David F. DuMouchel, Detroit, Mich., Albert J. Krieger, Miami, Fla., for defendant-appellant in No. 79–5318.

Norman London, Lawrence Fleming, St. Louis, Mo., for defendant-appellant in No. 79–5319.

Neil H. Fink, Detroit, Mich., for defendant-appellant in No. 79–5320.

James K. Robinson, U. S. Atty., Detroit, Mich., C. Stanley Hunterton, Sp. Atty., Las Vegas Strike Force, U. S. Dept. of Justice, Las Vegas, Nev., for plaintiff-appellee.

Before WEICK, LIVELY and BROWN, Circuit Judges.

WEICK, Circuit Judge.

Appellants Charles Goldfarb and James Abraham appeal from judgments of conviction entered upon jury verdicts of guilty of the substantive offense prescribed by the Travel Act, 18 U.S.C. § 1952.[1] All of the appellants appeal from judgments of conviction for conspiracy to violate the Travel Act, 18 U.S.C. § 371.[2] The appeals were consolidated for oral argument.

The appellants raise a number of issues on appeal[3] in their separate briefs. Each

---

1. 18 U.S.C. § 1952 provides in pertinent part that:

    (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

    \* \* \* \* \* \*

    (3) ... promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

    and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

    (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling ... in violation of the laws of the State in which they are committed or of the United States, ...

2. 18 U.S.C. § 371 provides:

    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do

    any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

3. These include the following:

    (a) Appellant Tamer raises issues dealing with the denial of his right to a unanimous verdict, the trial court's failure to exclude certain evidence, the court's instructions to the jury and denial of his motion to suppress.

    (b) Aladdin contends that the conspiracy against it was a legal and factual impossibility; that the indictment should have been dismissed for vagueness or in the alternative that the court erred in failing to grant the motion for a bill of particulars; and that the court erred in failing to grant its motion for severance.

    (c) Abraham contends that the evidence against him was insufficient to support his conviction; that certain evidence of an uncharged conspiracy should not have been ad-

appellant assigns errors which pertain specifically to the government's case against him, and the appellants together present a number of common arguments. One such common argument has several facets and is variously formulated by each appellant. It relates to the treatment by the court of Gaming Regulations promulgated by the Nevada Gaming Commission pursuant to statutory authority, violations of which appellants claim do not constitute unlawful activity as prohibited by the Travel Act.

District Judge Feikens carefully considered all of these issues in his "Opinion Denying Post Trial Motions" for judgments of acquittal, new trial, and arrest of judgment. App. 438–458. We agree with his decision and affirm the judgments of conviction for the reasons set forth therein on which we will elaborate hereinafter.

Judge Feikens denied a pretrial motion of the defendants to dismiss the indictment in an opinion reported in *United States v. Goldfarb*, 464 F.Supp. 565 (E.D.Mich.1979) in which he ruled upon the constitutionality of the Nevada Gaming Control Act and held it was not unconstitutional as being violative of the due process rights of defendant Goldfarb who was denied a gaming license.

In these appeals, the parties have filed four volumes of appendices, 4,000 pages of transcripts, and tapes recording conversations played for the jury but not included in the transcripts.

Mostly issues of law are raised in the briefs. The brief of Goldfarb's counsel commendably states: "The sufficiency of the evidence to sustain the jury verdict is not in question here."

Goldfarb had a remedy in the state court of Nevada which he invoked to compel the issuance of a license to him but he dismissed the suit. The trouble here is that Goldfarb and the other defendants, by concealment and violation of Nevada statutes and their implementing regulations authorized by the statutes, were actually engaged in the illegal unlicensed management, maintenance, control and operation of the hotel and casino.

### I

Defendant-appellant Charles Goldfarb was a bondsman who resided in Birmingham, Michigan. In 1971, he and a small group of investors purchased the Aladdin Hotel and casino, located in Las Vegas, Nevada, which at that time was owned by the Recrion Corporation. Goldfarb then applied to the State Gaming Control Board/Nevada Gaming Commission for licensure as a stockholder-officer of the new corporation, Aladdin Hotel Corporation. His request was denied when the Nevada Gaming Commission determined that he had an "unsuitable background and unsuitable associations." Goldfarb then divested himself of his eight percent (8%) interest in the hotel-casino. He later acquired an option to purchase stock from a licensed stockholder of the new corporation and reapplied for a stockholder's license. That application is still pending and has not been ruled upon by the Commission. Apparently, it has not been pressed.

The bulk of the evidence presented against the appellants consisted of over 100 telephone conversations intercepted by the

mitted; that certain in camera proceedings conducted to the exclusion of Abraham constitute reversible error; and that he was entitled to a mistrial as a result of the prosecution's allegedly irrelevant and prejudicial questioning of a character witness.

(d) Monazym challenges the sufficiency of the evidence against him; alleges the existence of multiple conspiracies and prejudicial variance; and claims violations of his 6th Amendment right to counsel as a result of the in camera proceedings which were conducted to his exclusion.

(e) Other aspects of the "common argument" involve variance and amendment of the indictment, and misstatements and misconstructions of Nevada statutes and regulations.

(f) Each appellant expressly adopts the arguments of his co-appellants to the extent they apply pursuant to the Federal Rules of Appellate Procedure, Rule 28(i).

All of these issues were carefully considered by District Judge Feikens in his "Opinion Denying Post Trial Motions" for judgments of acquittal, new trial, and arrest of judgment. App. 438–458.

government agents pursuant to court authorization. In all, approximately 15,000 calls were intercepted. The conversations introduced at trial were between Goldfarb and his co-defendants: James Tamer, the Entertainment Director of the Aladdin; James Abraham, the Executive Vice-President and General Manager of the Aladdin; and Edward Monazym, a Casino employee; as well as some calls between third parties and the various co-defendants.

The evidence adduced at trial showed that Goldfarb, having failed in his attempt to become a licensee owner of the hotel casino, did with the aid of the other defendants, maintain a secret and illegal role in the ownership, operation, conducting and carrying on of the gaming operations of the hotel casino. He recommended complimentary services, including free accommodations, for certain customers and had a hand in arranging for the extension of credit for individuals whom he sent to the hotel. His advice and assistance was sought and given concerning certain financial problems of the hotel as well, including arrangements for emergency financing with false net worth statements to an unnamed bank or banks and also possible sale or lease of the hotel. He finally arranged for a loan from the Teamsters Pension Fund. The government contended that this was in keeping with the defendants' scheme to engage in the clandestine ownership, conducting and carrying on of the gaming operations of the Aladdin by persons not licensed to do so and whose interest in the casino had been concealed from the state in violation of certain Nevada statutes and regulations.

The defendants contended that the evidence was perfectly consistent with the fact that Goldfarb was a valued customer of the casino; a former investor, and possibly a future stockholder-officer of the corporation; a close associate of the management personnel of the hotel; and an individual who had used his contacts to direct many so-called "highrollers" to the hotel, many of whom then became regular customers who lost large sums in gambling.

This was a disputed issue of fact requiring resolution by the jury.

The Travel Act, as applied to the instant case, required that a facility of interstate commerce (here a telephone) be used to promote, establish, carry on, etc., an unlawful activity. "Unlawful activity" is defined as any business enterprise involving gambling offenses in violation of the laws of the state in which they are committed.[4]

There is some dispute as to the nature and essentiality of the underlying state law violation, although most decisions agree that it is the violation of federal law which is the gravamen of a Travel Act offense. *United States v. Prince*, 529 F.2d 1108 (6th Cir. 1976), *cert. den.*, 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105; *United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974), *cert. den.*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Some courts hold that proof of the commission or attempted commission of a state defined criminal offense is an essential element of a Travel Act conviction, *United States v. Hiatt*, 527 F.2d 1048 (9th Cir. 1975); *United States v. Polizzi, supra;* *United States v. Kahn*, 472 F.2d 272 (2d Cir. 1973), *cert. den.*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958, while others hold that it is not. *United States v. Prince*, 515 F.2d 564 (5th Cir. 1975), *cert. den.*, *Craft v. United States*, 423 U.S. 1032, 96 S.Ct. 563, 46 L.Ed.2d 406; *United States v. Goldfarb*, 464 F.Supp. 565 (E.D.Mich.1979). It is certainly true that the state crime need not be actually accomplished. *United States v. Pomponio*, 511 F.2d 953 (4th Cir. 1975), *cert. den.*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105.

It is abundantly clear that as a predicate to a Travel Act conviction, absent a distinct violation of a law of the United States, the defendants must have engaged in some form of unlawful activity prohibited by the law of the State of Nevada. This contention is beyond dispute and amply supported by the language of the Act and by the case law.

---

4. See footnote 1, *supra.*

## II

The defendants-appellants were indicted on a four-count Revised Indictment.[5] In Count One of the indictment, Goldfarb was charged with a substantive violation of the Travel Act. The alleged "unlawful activity" was the

ownership, operation, conducting and carrying on of gaming operations of a Las Vegas, Nevada gaming casino, the ALADDIN HOTEL AND CASINO, by a person who was not licensed by and whose interest in the gaming casino had been concealed from agencies of the State of Nevada in violation of Nevada Revised Statutes, Sections 463.160.1(a)[6] and 463.335,[7] and Nevada Gaming Commission Regulations 3.100 paragraph 1, (b), (d), (f), (g) and (i), 3.100 paragraph 3,[8] 3.110[9] and 8.060.[10]

5. The original indictment consisting of 22 counts was found to be multiplicious by the trial court.

6. NRS § 463.160(1)(a) provides:
   License required.
   1. It is unlawful for any person, either as owner, lessee or employee, whether for hire or not, either solely or in conjunction with others:
   (a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any game or slot machine as defined in this chapter, or to operate, carry on, conduct or maintain any horserace book or sports pool;
   \* \* \* \* \*
   without having first procured, and thereafter maintaining in full force and effect, all federal, state, county and municipal gaming licenses as required by statute or ordinance or by the governing board of any unincorporated city or town.

7. NRS § 463.335 provides in pertinent part:
   Gaming employees required to hold work permits; hearings and review; confidential records; expiration of work permits.
   1. As used in this section:
   (a) "Gaming employee" means any person connected directly with the operation of a nonrestricted establishment, and includes without limitation:
   (1) Boxmen;
   (2) Cashiers;
   (3) Dealers;
   (4) Floormen;
   (5) Hosts or other persons empowered to extend credit or complimentary services;
   (6) Keno runners;
   (7) Keno writers;
   (8) Machine mechanics;
   (9) Security personnel;
   (10) Shift or pit bosses;
   (11) Shills; and
   (12) Supervisors or managers.
   "Gaming employee" does not include bartenders, cocktail waitresses or other persons engaged in preparing or serving food or beverages. . . .

8. Nevada Gaming Commission Regulation 3.100 provides in pertinent part:
   Employee report.

   1. Annually, on or before the 15th of July, each nonrestricted licensee, as defined in Reg. 4.030.1(b), shall submit an employee report to the board on a form to be furnished by the board. The report shall identify every individual who is directly or indirectly engaged in the administration or supervision of the gaming operations or physical security activities of such nonrestricted licensee. The following classes of gaming employees are presumed to be actively and directly engaged in the administration or supervision of gaming:

   .  .  .  .

   (b) All individuals who may approve or extend gaming credit in any amount, or whose recommendations in this regard are ordinarily sought or followed:

   .  .  .  .

   (d) All individuals who have the authority to supervise or direct a shift of any gaming or security activity, including but not limited to supervision or direction of the pit area, keno or bingo games, slot machines, race or sports books, pari-mutuel operations, or any persons having authority to supervise or direct such persons;

   .  .  .  .

   (f) All individuals who may approve or extend to casino patrons complimentary house services other than beverages only;
   (g) All individuals who supervise or direct other employees engaged in the control of gaming assets and revenues and record keeping, including the recording of cash and evidences of indebtedness, and the maintenance, review or control of the records, accounts, and reports of transactions which are required to be kept pursuant to Reg. 6;

   .  .  .  .

   (i) All individuals who individually or as a part of a group formulate management policy.

   .  .  .  .

   3. Any changes, additions, or deletions to any information contained within the annual employee report which occurs subsequent to the filing of the report and prior to the filing of the report for the next calendar year shall be reported to the board in writing no less than 10 days after the end of the calendar

The indictment alleges specific acts committed by Goldfarb in the course of the performance of the unlawful activity.

Appellant Tamer was acquitted by the jury of the substantive Travel Act count but was convicted of conspiracy.

Count Three charged appellant Abraham with a substantive violation of the Travel Act in much the same language as the charge against Goldfarb. The alleged unlawful activity was based upon the same Nevada Statutes and Regulations.[11] Abraham was alleged to have discussed with Goldfarb the extension of complimentary privileges to patrons of the Aladdin which constituted, directly or indirectly, the administration, supervision and influence of Goldfarb over the gaming operations of the Aladdin with the consent and assistance of Abraham and in violation of the aforementioned statutes and regulations. Abraham was convicted on this count.

Count Four is the conspiracy count of the indictment on which all of the defendants were convicted. It charged that the defendants willfully and knowingly conspired to use facilities of interstate commerce to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely; the ownership, operation, conducting and carrying on of gaming operations of a Las Vegas, Nevada gaming Casino by persons who were not licensed to do so and whose interest in the gaming casino had been concealed from the State of Nevada and did thereafter commit acts in order to promote this unlawful activity, all in violation of 18 U.S.C. § 1952, 18 U.S.C. § 371.

■ As before stated, the appellants filed two joint motions to dismiss the original indictment. Those motions apply equally to the revised four-count indictment. In the motion the appellants argued, *inter alia*, that Nevada Gaming Commission Regulations are not "law" for the purposes of criminal prosecutions. From the earliest stages of the proceedings, the defendants objected to and expressed concern over the

---

quarter during which the change, addition, or deletion occurred.

9. Nevada Gaming Commission Regulation 3.110 provides in pertinent part:
Key employee.
1. Any executive, employee, or agent of a gaming licensee having the power to exercise a significant influence over decisions concerning any part of the operation of a gaming licensee or who is listed or should be listed in the annual report required by Reg. 3.100 is a key employee.
2. Whenever it is the judgment of at least 3 members of the commission that the public interest and the policies set forth in Nevada Revised Statutes Chapter 463, the Nevada Gaming Control Act, will be served by requiring any key employee to be licensed, the commission shall serve notice of such determination upon the licensee. The commission shall not be restricted by the title of the job performed but shall consider the functions and responsibilities of the person involved in making its decision as to key employee status. Grounds for requiring licensing of a key employee which are deemed to serve the public interest and the policies of the Nevada Gaming Control Act include but are not limited to the following:
(a) The key employee is new to the industry, the particular gaming establishment, the position, or the level of influence or responsibility which he has and the board or commission has little or outdated information concerning his character, background, reputation, or associations, or
(b) Information has been received by the board or commission which, if true, would constitute grounds for a finding of unsuitability to be associated with a gaming enterprise.

10. Nevada Gaming Commission Regulation 8.060 provides:
Participation in operations. Except as and to the extent provided in these regulations pertaining to emergency situations, or on written approval of the commission, no person who proposes to acquire an interest in any licensed gaming operation, in a licensee or in a holding company shall in connection therewith take any part or be permitted to take any part whatever, as an employee or otherwise, in the conduct of such gaming operations or in the operation of the establishment wherein such gaming operations are conducted during the pendency of his application for license or to be permitted to acquire such interest.

11. The statutes and regulations relied upon are identical except that Count Three omits Nevada Gaming Regulation 3.100(1)(b) and (g).

notion that a violation of a Nevada Gaming Commission regulation could form the predicate state law violation required for a federal prosecution under the Travel Act. It could not in and of itself.

In response to the motion to dismiss, the government stated that:

> . . . the predicate "unlawful activity" in this prosecution arises from the violations of the cited Nevada *statutes* in each count. The additional citation to the regulations is solely to provide additional particularity in indicating the application of the statute to the specific activity described in each count. We do not quarrel with the defense position that violations of the regulations in and of themselves are not criminal acts within the purview of the Travel Act. . . .
>
> We do not quarrel that the defendants would be entitled to a charge that in order to find a defendant guilty of a particular count that it must find a defendant violated the provisions of the Nevada statute cited and described therein. (Government's Response to Motion to Dismiss, Appendix p. 138–39.)

Still claiming inability to comprehend and therefore defend against the charges, the defendants filed a joint motion for a bill of particulars. The court requested the parties to agree among themselves as to the particulars which they apparently did.

> The court instructed the jury as follows: Now as to the meaning of the phrase unlawful activity in the Travel Act, the State of Nevada has a comprehensive scheme of regulatory statutes. Under those statutes a gaming commission and a gaming board are established and they are commanded to and have enacted regulations which have the force of law. It is that law which defines unlawful activity.

In *Berman v. Riverside Casino Corp.,* 247 F.Supp. 243, 248 (D.Nev.1964), *aff'd* 354 F.2d 43 (9th Cir. 1965), the court held that regulations promulgated by the Nevada Gaming Commission "have the force and effect of law." Cf. *United States v. Polizzi,* 500 F.2d 856, 875 (9th Cir. 1974), *cert. den.,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

N.R.S. 463.1594 specifically provides that the regulations are intended to implement the provisions of the statutes requiring disclosure of a corporate licensee's key personnel. Also, N.R.S. 463.150(2)(a) provides that the regulations shall prescribe "the method and form of application which any applicant for a gaming license . . . shall follow and complete . . . ." The court was thus required to include an instruction on regulations so that the jury would not completely disregard them. The court did not instruct the jury at any place that a violation of a regulation, in and of itself, constituted an "unlawful activity." To give such an instruction would have been prejudicial error. *United States v. Eaton,* 144 U.S. 677, 12 S.Ct. 764, 36 L.Ed. 591 (1892); *Singer v. United States,* 323 U.S. 338, 65 S.Ct. 282, 89 L.Ed. 285 (1944).

In *United States v. Grimaud,* 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1910) the court stated:

> From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions "power to fill up the details" by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress or measured by the injury done.

Reliance by appellants on *United States v. Gordon,* 464 F.2d 357 (9th Cir. 1972) is misplaced. That case held that bookmakers and their employees do not engage in illegal gambling business within the prohibition of federal law by violating nonpenal regulations of state gaming commission. *Gordon* appears to be somewhat in conflict with the

subsequent decision of the Ninth Circuit in *Polizzi* and is not even cited or discussed in *Polizzi*.

In *United States v. Seelig*, 622 F.2d 207, 210 (6th Cir. 1980), we considered violations of the Controlled Substances Act, 21 U.S.C. § 841(a)(1) and regulations promulgated thereunder which were authorized by Congress. There, as here, the defendants contended that violations of the regulations did not constitute an offense. We stated:

> The combination of § 829(c) and § 822(b) thus requires a person to dispense or distribute a schedule V drug for a medical purpose and to be within the authority of their registration as determined by the Attorney General. Section 822(a) requires every person who distributes or dispenses controlled substances to register with the Attorney General. Section 821 authorizes the Attorney General to promulgate rules and regulations relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances. Section 871(b) authorizes the Attorney General to promulgate and enforce rules, regulations and procedures that he deems necessary for the efficient execution of his functions.

> Although Congress was not as clear in this statute as in the one involved in *Grimaud*, this Court is satisfied that the statute does expressly, albeit in a convoluted fashion, provide that a violation of the promulgated rules constitutes an unlawful act under the Controlled Substances Act. Thus, counts 1–165 do charge crimes.

During the presentation of evidence to the jury in response to the defendants' and the trial court's desire to have the legal theory of the case made clear, the government filed a document entitled "Government's Theory of the Case." Here again, the government disclaimed reliance upon the Nevada Gaming Regulations alone, stating that: "to be sure, a violation of the Regulations which is not concomitant with a statutory violation will not support a Travel Act violation." (Appendix, p. 283)

Thus the violation of the Nevada statutes and implementing regulations would constitute unlawful activity under the Travel Act. The disclosure provisions required by Regulation 3.100 are cumulative to those contained in the Nevada statutes. N.R.S. 463.165, 463.339, 463.520, 463.530, 463.560.

In any event, under the conspiracy count, the violation of the regulations alone would certainly be considered as overt acts by the defendants committing them which are ingredients of the crime of conspiracy.

## III

With this principle in mind, we now turn to the trial court's instruction to the jury on the meaning of "unlawful activity" and the significance of the Nevada Gaming Regulations.

The court first instructed the jury on Count IV of the indictment, the conspiracy charge. After preliminary matters of defining conspiracy and its elements to the jury, the court began to instruct on the application of the Travel Act. After reading the Act, in pertinent part, the court instructed on the meaning of the phrase "unlawful activity." As a general background, the court instructed as follows:

> ... the state of Nevada has a comprehensive scheme of regulatory statutes. Under these statutes a gaming commission and a gaming board are established and they are commanded to and have enacted regulations which have the force of law. It is that law which defines unlawful activity.

> In order to regulate gambling under Nevada law these statutes require full disclosures. Only through full and accurate disclosure of all persons who are connected with gambling in Nevada can the Nevada gaming authorities properly perform their functions in excluding from the industry all who are in the authorities' opinions, unsuitable or undesirable for any number of reasons. (Appendix 1205–06)

The court further instructed the jury on unlawful activity based upon a violation of Nevada statutory law as follows:

Nevada Revised Statute 463.530 requires that all persons who require [sic] to become owners or shareholders in a gaming operation must have come before the Nevada gaming authorities for determination as to the suitability for license. The Nevada gaming authorities then make a decision whether to then issue a license to an applicant. If they deny the applicant a license, that person may not then thereafter exercise any ownership or operation, conduct of the gaming affairs of the casino.

Another Nevada statute, NSR 463.130, states that the violation of these Nevada gaming statutes is a crime, a gross misdemeanor. Thus, by concealment of his ownership or operation or conduct in the gaming conspiracy, a person may violate the Nevada laws.

Keep in mind it is not the concealment itself which is the violation of the statute I have just discussed but rather the violation is the unlicensed ownership or operation of the gaming casino which is accomplished by concealment. (Appendix, p. 1206–07)

The court then continued:

I now take up another aspect of the Nevada laws on gambling. One of the regulations, [3].100, which is mandated by Nevada statute is requires, [sic] all holders of non-restricted licenses to disclose to the Nevada gaming authorities names of all persons exercising significant control and influence over gaming. Any changes in such activities must also be reported to the Nevada gaming authorities because of a strong state policy requiring disclosure of all persons who have significant control and influence as to gaming, and because of the statutory command that all gaming licenses which, whether held by a corporation such as the Aladdin Hotel or by individuals, must be maintained in conformity with all relevant provisions. I instruct you that it is illegal under Nevada gaming laws for anyone exercising a significant control and influence as to gaming to conceal that control and influence from the Nevada gaming authorities. The essence or gist of the vio-

lation I have just outlined is concealment, the wilful failure to disclose. This type of violation I described earlier–that violation having to do with unlawful, unlicensed operation of a gaming casino, where the concealment is a means to achieve the violation but not itself the actual unlawful activity. (Appendix, pp. 1207–08).

This in our opinion correctly stated the Nevada law.

■ In the instruction on the substantive offense charge against Goldfarb, the court stated that:

[h]eretofore in connection with the charge of conspiracy, I have discussed in detail the phrase "unlawful activity." Without repeating the instructions I gave you there, but with the request that you all keep those instructions in mind here, I specifically charge you that the unlawful activity which it is alleged the defendant Goldfarb engaged in in violation of the Travel Act is as follows: . . .

The court then described a statutory theory based on Nevada Revised Statutes § 463.335 as was done in the conspiracy charge. In concluding the instruction, the court again offered the jury the elements of unlawful activity:

Additionally, in order for you to find the Defendant Goldfarb guilty of the charges contained in Count I of the indictment, the Government must also prove beyond a reasonable doubt either that:

(1) Defendant Goldfarb willfully engaged in the ownership, operation or conducting or carrying on of gaming operations of the Aladdin Hotel and Casino without a license from the Nevada Gaming Authorities to do so, or;

(2) Defendant Goldfarb willfully concealed his ownership, operation or conducting or carrying on of gaming operations of the Aladdin Hotel and Casino from the Nevada Gaming Authorities for which he was not licensed.

Or both of these elements. (Appendix pp. 1217–18)

**432**

This instruction was not duplicitous as claimed for either or both elements constitute an offense under Nevada law. The jury was also instructed that its verdict had to be unanimous.

In its opinion denying post trial motions, the court relied on the Nevada statutes which it stated were broad enough to encompass Goldfarb's conduct. (App. 440)

## IV

The indictment charged Tamer with violating NRS 463.160.1(a) and Nevada Gaming Commission Regulations 3.100(1)(i), 3.100(3) and 3.110. He was charged with performing as a "key employee" without being licensed to do so. Tamer was acquitted of the substantive Travel Act violation.

After reading the indictment and summarizing the Travel Act, the court instructed on the meaning of "unlawful activity" as follows:

> Under Nevada gaming laws a casino (or non-restricted licensee as it is called) must report to the Nevada Gaming Authorities the identity of anyone who is directly or indirectly involved in the casino's administration; that is, anyone who has a significant influence and control at the casino. The regulation that requires this disclosure has the force of law and its requirement of disclosure is in harmony with a number of other Nevada gaming statutes. Thus, under Nevada gaming law, it is required that the casino disclose the identity of anyone exerting significant influence and control at the casino. The disclosure is necessary so that the Nevada Gaming Authorities can regulate gambling by determining that such a person should be licensed, if he is to continue the exercise of significant control and influence at the casino. Now, the Aladdin itself is not charged with this violation. However, defendant Tamer is; it is charged in this indictment that defendant Tamer did, in concert with the Aladdin, cause his true role at the casino to be concealed from the Nevada Gaming Authorities, in violation of Nevada gaming laws.

## V

As to Abraham, the district court in instructing on Count III of the indictment again carried through its interpretation of "unlawful activity." The court charged the jury as follows:

> The unlawful activity here charged is the same kind of unlawful activity as is charged in Count I against Defendant Goldfarb, although the telephone call alleged in the indictment between defendant Goldfarb and defendant Abraham occurred on March 15, 1977. (Appendix pp. 1226–27).

\* \* \* \* \* \*

> Additionally, in order for you to find defendant Abraham guilty of the charges contained in Count III of the indictment, the Government must also prove beyond a reasonable doubt that defendant Abraham aided and abetted defendant Goldfarb in either willfully engaging in the ownership, operation, or conducting or carrying on of gaming operations of the Aladdin Hotel and Casino without a license from the Nevada Gaming Authorities to do so, or in aiding and abetting the defendant Goldfarb in willfully concealing his ownership, operation or conducting or carrying on of gaming operations of the Aladdin Hotel and Casino from the Nevada Gaming Authorities for which he was not licensed; or both of these elements. (Appendix p. 1229)

Thus the district court instructed the jury on the unlawful activities; one based on the unlicensed operation of the Aladdin; the other based on concealment which found its origin in the court's construction of the Nevada Statutes and Gaming Regulations, especially 3.100. In our opinion these instructions were correct.

## VI

■ Goldfarb contends that there was a variance between the allegations in the indictment and the evidence which resulted in a judicial amendment of the indictment. Judge Feikens correctly dealt with these

issues in his opinion denying post trial motions stating:

It appears Goldfarb alludes to principles of variance and amendment. The two concepts are closely related. Variance refers to the failure of the government's proofs to conform to the indictment. A variance is not fatal to the prosecution unless the defendant could not reasonably have anticipated from the indictment what evidence would be presented at trial or unless the indictment is so vague as not to bar subsequent prosecution on the same offense. *United States v. Knuckles*, 581 F.2d 305, 309, 311, (2nd Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Fruehauf Corp.*, 577 F.2d 1038, 1056 (6th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Dunn*, 577 F.2d 119, 123 (10th Cir. 1978); *Watson v. Jago*, 558 F.2d 330, 333–334 (6th Cir. 1977); *United States v. Maselli*, 534 F.2d 1197, 1201–1202 (6th Cir. 1976). A variance is not ground for reversal unless the defendant's substantial rights are abridged. *United States v. Berger*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1934). In this case I find no prejudicial variance.

The apparent amendment claim needs more analysis, but it too is without merit. It is settled since *Ex Parte Bain*, 121 U.S. 1, 10, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887) that neither the court nor the prosecutor may substantially change the indictment to "suit its own notions of what it ought to have been or what the grand jury would probably have made it if their attention had been called to suggested changes ..." This is in keeping with the principle that a court may not establish standards of conduct upon pain of imprisonment; such is the legislature's domain. An amendment to the indictment is *per se* reversible error. *United States v. Crocker*, 568 F.2d 1049, 1059 (3rd Cir. 1977), *United States v. Fruehauf, supra*, at 1056. An amendment may be express or "constructive" (effective). *Id.* In determining whether there has been a constructive amendment inquiry should focus

on whether any essential element of the crime was proved by facts different than those alleged. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Thus, if the indictment alleges one sort of false testimony but the government is permitted to prove another sort, false testimony being necessary for conviction, an amendment has occurred. *United States v. Crocker, supra*. Similarly, in a Hobbs Act case, if a grand jury alleges one sort of interstate nexus while proof and argument show another, an amendment has occurred. *Stirone v. United States, supra.* See *United States v. Prejean*, 494 F.2d 495, 497 (5th Cir. 1974); *United States v. Vesaas*, 586 F.2d 101, 103 (8th Cir. 1978).

In this case, there were three elements the government was required to prove: (1) the use of an interstate facility; (2) actual or attempted promotion, etc. of an unlawful activity; (3) specific intent. *United States v. Prince*, 529 F.2d 1108, 1112 (6th Cir.), *cert. denied* 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976). The proofs did not diverge from the course established by the requirement of these elements. The only apparent argument available to Goldfarb (and the other Defendants) is that the grand jury did not pass upon the exact shape of the illegal acts in Nevada, which it is their constitutional right to have done. I find this contention without merit. The grand jury needed to know enough of the Nevada gaming laws to make the indictment sufficient, which it did. My interpretation of Nevada gaming law presented Defendants with no new factual charges that they were required to meet, to use variance phraseology, nor did it allow either proof or argument of a new factual basis for any element of the crime, to use amendment terminology. Moreover, the allegation as to the Nevada offense was broad enough to include the specific crime I have already explained. It has often been held that one way to guard against a constructive amendment claim is to draft an indictment with generality,

*United States v. Crocker, supra,* at 1059, so long as it contains the necessary specificity.

## VII

▇ We find no prejudicial error in the court's denial of Abraham's motion to declare a mistrial because of improper cross-examination of a character witness. One of the character witnesses was General Ralph G. Taylor retired from the United States Air Force. Attempts were made by Abraham's attorney to introduce into evidence Abraham's gallantry as an officer and pilot, his two tours in Vietnam and his communications with the White House. The court excluded such evidence. We agree that it was not admissible except upon conviction to be considered in mitigation of the sentence. Error was assigned as to the cross-examination of the character witness Lovell, a former city attorney in Las Vegas, who volunteered that Abraham enjoyed a good reputation with Nevada's "law enforcement community." He was asked upon cross-examination whether he had heard that in order for a shop or store to do business with Aladdin Hotel Corporation to obtain store space in the area that payments were made personally to Abraham, not to the corporation. Lovell answered, "No, I don't know that." Before asking the question, at a side bar conference with the court not in the presence of the jury, the government produced evidence showing justification namely, the cancelled check and the court permitted the question to be answered and gave proper instruction to the jury as to its purpose. Further proceedings developed thereafter including rebuttal and surrebuttal evidence and when it appeared to everyone that this was creating a trial within a trial, the government moved to withdraw the question, in which counsel for Abraham joined. The trial court granted the motion finding that "... the spirit of *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948) had been observed and the prejudice, if any, was dissipated in Abraham's favor." App. 452, 453. We find no abuse of discretion on the part of the District Judge in his handling of these issues.

Abraham and Monazym assign error because the trial court held certain *in camera* proceedings to which they were not admitted. Abraham and Tamer assign error in the admission of evidence of tape recorded conversations and documents tending to prove that Goldfarb and Tamer used their influence with Leonard, the Prosecuting Attorney of Genesee County in local court proceedings which Tamer believed would assist him in securing a license in Nevada.

A special Grand Jury sought to return an indictment against Mr. Leonard which was not signed by the United States Attorney. Chief Judge Kennedy who conducted the *in camera* proceeding, wrote an opinion ordering the files sealed. The trial judge ordered that the defendants who had not participated in the *in camera* proceedings be given access to them.

The government had issued a subpoena for the testimony of Mr. Leonard but obtained a stipulation from all defense counsel which obviated the necessity for its production.

▇ We find no abuse of discretion on the part of the trial judge nor any prejudice to Abraham and Monazym (See Opinion Denying Post Trial Motions, (App. 456)), nor was there any abuse of discretion in denying the motions for a severance or Tamer's motion to suppress evidence.

## VIII

▇ Appellant Monazym challenges the sufficiency of the evidence to support his conviction by the jury. The evidence is detailed by the District Judge in his Opinion Denying Post Trial Motions. (App. 449, 450). The evidence and the inferences to be reasonably drawn therefrom must be viewed in the most favorable light in favor of the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Dye,* 508 F.2d 1226 (6th Cir. 1974); *United States v. Green,* 548 F.2d 1261 (6th Cir. 1977). So viewed, we are of the opinion that the verdict of the jury is supported by abun-

dant evidence. In our opinion, the indictment charged only a single conspiracy.

## IX

Aladdin contends that the district court erred in denying its motion for a severance. It alleges that it could not defend itself except through the testimony of its alleged agents, who, as defendants in this joint trial, had countervailing Fifth Amendment rights·not to testify.

The trouble with this argument is that the proof at the trial showed that conspiratorial acts were committed by at least six other officers, agents and employees of Aladdin who were not defendants. Aladdin did not call any of them to testify in its behalf. No showing was made by Aladdin that any of its officers, agents or employees were willing to testify in its behalf or exculpate it. There was no showing that in separate trials any defendant would waive his Fifth Amendment privilege.

This matter was addressed entirely to the sound discretion of the district court. Aladdin had a heavy burden to overcome which it was unable to do. *Cf. United States v. Vigil*, 561 F.2d 1316 (9th Cir. 1977).

### Conclusion

The judgments of conviction are affirmed.