**UNITED STATES of America, Plaintiff,**

v.

**Charles B. GOLDFARB, James Tamer, Edward Monazym, James Abraham, and Aladdin Hotel Corporation, Defendants.**

Crim. A. No. 8–80572.

United States District Court,
E. D. Michigan, S. D.

Jan. 2, 1979.

Paul E. Coffey, Atty. in Charge, Detroit Strike Force, U. S. Dept. of Justice, Detroit, Mich., for plaintiff U. S. A.; C. Stanley Hunterton, Sp. Atty., Detroit, Mich., of counsel.

N. C. Deday LaRene, Detroit, Mich., for defendant Goldfarb.

S. Allen Early, Jr., Detroit, Mich., Gary Logan, Las Vegas, Nev., for defendant Tamer; Neil H. Fink, Detroit, Mich., of counsel.

Clyde B. Pritchard, Detroit, Mich., for defendant Monazym.

David F. DuMouchel, Detroit, Mich., for defendant Abraham; Albert J. Krieger, Miami, Fla., of counsel.

Sorkis J. Webbe, Sr., St. Louis, Mo., for defendant Aladdin Hotel Corp.; Norman S. London, St. Louis, Mo., of counsel.

## OPINION DENYING DEFENDANT GOLDFARB'S FIRST MOTION TO DISMISS INDICTMENT (16).

FEIKENS, District Judge.

Several individuals and the Aladdin Hotel Corporation were indicted in August of 1978 on one count of violating 18 U.S.C. § 371 (conspiracy), 19 counts of violating 18

U.S.C. § 1952 ("Travel Act"), and two counts involving 18 U.S.C. § 1962 ("RICO").

The indictment charges that between December of 1976 and March of 1977 the defendants used interstate telephone lines to own and operate the Aladdin Hotel & Casino without having procured licenses required under Nevada law.

### Relevant Statutes and Regulations

Under Nevada law it is unlawful for any person either as an owner or employee to operate or maintain any gambling establishment without first procuring and thereafter maintaining all permits and/or licenses which the state or local government may require. Nev.Rev.Stat. § 463.160.1(a)

Two other sections define exactly who must possess a license. Under Nev.Rev. Stat. § 463.530 certain "key employees" of gaming *licensees* (such as the Aladdin) may be required to apply for licenses before the Nevada Gaming Commission if in the Commission's opinion the public interest will thereby be served. The Commission learns who it should require to submit to licensure scrutiny by requiring an annual report from each licensee identifying every individual directly or indirectly engaged in the administration or supervision of the gaming operations. Certain employees are presumptively so engaged. They are, any individual who: may approve or extend gaming credit or whose recommendations in this respect are ordinarily followed; supervises or directs or who has the authority to supervise or direct a gaming shift; may approve or extend complimentary house services; supervises those who control gaming assets or records; and, anyone who helps to formulate management policy. Nevada Gaming Commission and State Gaming Control Board Regulation 3.100.1(b), (d), (f), (g) & (i).

Regulation 3.110.1 defines any employee or agent having significant influence over the licensee's operations or who is listed in the annual report as a "key employee" who may be required to submit for licensure. Regulation 3.110.2 sets forth the criteria upon which the Commission decides which

key employees must be licensed. Regulation 8.060 provides that no one who proposes to acquire an interest in a gaming operation shall take any part in the management thereof during the pendency of his application for licensing.

Under Nev.Rev.Stat. § 463.335 persons defined as "gaming employees" may not be employed unless they hold all work permits required by the city or county in which the work is performed. Persons empowered to extend credit or complimentary services are considered "gaming employees." Nev.Rev. Stat. § 463.335.1.

The penalty provision of the Gaming Control Act provides:

The violation of any of the provisions of this chapter, the penalty for which is not herein specifically fixed, is a gross misdemeanor. Nev.Rev.Stat. § 463.360

The relevant federal statute is 18 U.S.C. § 1952 (Travel Act) which provides:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail with intent to—

\* \* \* \* \* \*

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means any business enterprise involving *gambling* . . . in violation of the laws of the State in which they are committed or of the United States . . . . [emphasis added]

The government's theory appears to be that Tamer, one of the defendants and the Entertainment Director at the Aladdin, maintained such influence there that he would have been required to hold a license under Nevada law had the extent of his control been known to the Nevada gaming authorities; that he concealed that control;

that he was not so licensed and thus violated § 463.160(1). Secondly, the government alleges that Goldfarb maintained a hidden interest in the Aladdin, exercising such control over its activities that had his interest been disclosed, he, too, would have been required to submit to licensure and hold a license under either § 463.160 or § 463.335; that he did not so submit nor was he licensed. The government claims that the other defendants conspired and acted to aid and facilitate this unlawful conduct, were inextricably bound up in what amounted to an illegal business enterprise to violate the Nevada gaming laws, and that they used interstate telephone lines to commit those violations.

As factual background, in 1971 Goldfarb applied for permission to become an incorporator of the Aladdin under a Nevada statute which at that time so provided. His application was denied. Subsequently, he applied for licensure as a shareholder, but protested a "waiver of rights" form that was required as a part of the application. The result was that the Nevada Gaming Control Board failed to process the application until in June of 1974 a suit was instituted in the 8th Judicial District of Nevada, the district which includes Las Vegas. In June of 1978 the suit was dismissed without prejudice when the Board agreed to withdraw the waiver. At no time relevant to these proceedings was Goldfarb licensed either to be employed by, own or manage the Aladdin. Tamer held a permit to be employed as the Entertainment Director of the Aladdin but is not licensed to otherwise participate in its management.

Defendants move the indictment be dismissed because the Nevada Gaming Control Act is unconstitutional.

### The Defendants' Theory

The Nevada Gaming Control Act has been definitively construed by the Nevada Supreme Court as setting forth a scheme in which gaming is viewed

> as a matter reserved to the states within the meaning of the Tenth Amendment to the United States Constitution. Within

this context we find no room for federally protected constitutional rights. This distinctively state problem is to be governed, controlled and regulated by the state legislature and, to the extent the legislature decrees, by the Nevada Constitution. It is apparent that if we were to recognize federal protections of this wholly privileged state enterprise, necessary state control would be substantially diminished and federal intrusion invited. [footnotes omitted]

*State v. Rosenthal,* 559 P.2d 830, 836 (Nev. 1977). However, the court distinguishes between applicants and licensees.

> A reasonable distinction exists between the status of one who seeks to acquire a license, and the status of one who possesses a work permit as a gaming employee. The former does not have existing privileges, but is attempting to acquire them. The latter does have an existing privilege, and is entitled to receive notice and a hearing before his privilege to work as a gaming employee can be nullified.

*Id.,* at 837.

Goldfarb claims that *Rosenthal,* as the pronouncement of the court of last resort in Nevada, binds this court, citing, *inter alia, Quong Ham Wah v. Industrial Accident Commission,* 255 U.S. 445, 41 S.Ct. 373, 65 L.Ed. 723 (1921); *Truax v. Corrigan,* 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254 (1921); and *United States v. Twelve Two Hundred Foot Reels,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); and that the *Rosenthal* case is, with the statute it construes, a unitary piece of law; the case and statute are inseparable.

Goldfarb next contends that one in his position—that of a license applicant—has certain constitutional rights which may not be so cavalierly abridged. He emphasizes the interpretation of due process which holds that "the touchstone of due process is protection . . . against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974), and notes that due process protections are not dependent upon whether the interest at issue is characteriz-

ed as a right or a privilege.[1]  *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

Goldfarb claims that the right to engage in a lawful occupation is a "fundamental one" whose denial should be attended by due process protections. *New State Ice Company v. Liebmann,* 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747 (1932); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 102, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Cafeteria Workers v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). More specifically, Goldfarb characterizes it as either an interest in "property", as defined in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (protected interests are claims to a benefit to which the holder has "more than an abstract need or desire . . . more than a unilateral expectation . . . [but] instead . . . a legitimate claim of entitlement . . .") and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), or, in "liberty" under either the interpretation which describes government actions which foreclose a range of opportunity as implicating protected interests, *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1967) (denial of admission to the practice of law); *Goldsmith v. United States Board of Tax Appeals,* 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (denial of accountant's right to practice before the Board of Tax Appeals); or the interpretation explained in *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

Goldfarb concludes that because the Nevada Gaming Control Act has been construed in a manner violative of his and other license applicants' constitutional rights it is unconstitutional and, therefore

void. As a logical concomitant, he believes there can be no prosecution under the Travel Act.

## FINDINGS AND CONCLUSIONS

■  I cannot agree that I am bound by the Nevada Supreme Court's pronouncements in *Rosenthal* with respect to the Gaming Act. The *Rosenthal* decision is not inextricably bound to that statute.

There are many cases which say that a state court's construction of its own statute is conclusive upon federal courts. See, for example, *Quong Ham Wah v. Industrial Accident Commission, supra,* 255 U.S. at 448, 41 S.Ct. at 374, where the Court states:

> It is elementary that this court is without authority to review and revise the construction affixed to a state statute as to a state matter by the court of last resort of the state.

However, the crucial distinction between that situation and the instant one is that in *Quong Ham* the question involved the substance of state law.

■  Here, we are concerned with a question of federal law; namely, the existence or non-existence of a Travel Act violation. I am not directly concerned with the content of the Nevada gaming law. The Travel Act is violated when acts illegal in Nevada are performed. The content of state law is a state matter under *Quong Ham* ; but that does not mean that I am bound by Nevada's pronouncements as to the constitutional ramifications of that content.[2]

■  Defendants maintain that the operative distinction in this case is between situations where the federal court is *applying* state law and those in which the federal court is *interpreting* state law (page 3 of

---

1.  Nev.Rev.Stat. § 463.130(2) states:

    Any license issued pursuant to this chapter shall be deemed to be a revocable privilege and no holder thereof shall be deemed to have acquired any vested rights therein or thereunder.

2.  To further illustrate this distinction, consider a situation in which it is claimed that a statutory scheme is unconstitutional because it fails to

provide sufficient judicial review of an administrative body's determination. The nature and extent of the judicial review available would be a question of state law. However, the effect severely restricted judicial review would have on the statute's constitutionality would not be a state but federal question. In the latter, what the state court says is not binding on a federal court.

Defendant's Supplemental Memorandum); the former situation being the one in which the federal court is "bound". I agree. Defendants err in characterizing this case as one in which I am *applying* state law. Due to the overriding federal purpose served by the Travel Act, *I must interpret all of the laws implicated by this prosecution,* including Nevada law. I am, therefore, not bound by the *Rosenthal* decision, whatever its constitutional merits or infirmities.

The case of *Angel v. Bullington,* 330 U.S. 183, 189, 67 S.Ct. 657, 91 L.Ed. 832 (1947) illustrates this principle. *Angel* was a diversity suit in which the Court acknowledged that North Carolina's construction of a jurisdictional statute was binding insofar as the state court had determined the statute's meaning and application to the suit's parties. The statute operated to bar the plaintiff's claim. He argued that, as such, it constituted an unconstitutional limitation on the state court's jurisdiction. The defendant responded that the state court had found no violation and that this was a matter upon which the state court's conclusion was preclusive. The Supreme Court disagreed and explained "[w]hen an asserted federal right is denied, the sufficiency of the grounds of denial is for this Court to decide." *Id.,* at 189, 67 S.Ct. at 660. Elaborating, the Court stated:

> . . . where resort is had to a federal court not on grounds of diversity of citizenship but because a federal right is claimed, *the limitations upon the courts of a State do not control a federal court sitting in the state. Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743. *Id.,* at 192, 67 S.Ct. at 662. [emphasis supplied]

I believe the instant case is analogous to *Angel.* The federal court is the forum here because federally created rights and liabilities are at issue. The Travel Act implements a federal solution to a federal problem.

This principle was dealt with perhaps more perceptively in P. Mishkin, "The Variousness of Federal Law: Competence and Discretion in the Choice of National and State Rules for Decision," 105 U.Pa.L.Rev. 797 (1957) (hereinafter "Mishkin").[3]

■ The author observes that state enactments are not self sufficient for all purposes. The federal judiciary is empowered to declare the governing law in areas that are substantially related to a program of national governmental operation. *Id.,* at 800. The Travel Act's legislative history demonstrates clearly its purpose to combat a problem of uniquely national scope: organized racketeering and crime. *United States v. Nardello,* 393 U.S. 286, 292, 89 S.Ct. 534, 21 L.Ed.2d 487 (1959); *Rewis v. United States,* 401 U.S. 808, 811 & *n.* 6, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1970). The Travel Act, in effect, implements such a program. Therefore, this is a suitable case for Mishkin's principle.

■ As Professor Mishkin observes, the clear implication of the *Clearfield*[4] doctrine is that any issue bearing a substantial relationship to an established national governmental function should be determined by reference to federal law. The constitutionality of the Gaming Control Act is a federal question.

■ I become more firmly convinced of this conclusion when I view the issue as federal incorporation of state law by reference. That is, the Travel Act incorporates Nevada state law in the area of gambling. Considered thus, even more latitude inheres in the federal judiciary. For example, in *R.F.C. v. Beaver County,* 328 U.S. 204, 208–9, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), a federal statute granted an exception to the R.F.C.'s tax immunity. It allowed the state to tax "real property." The question was whether a state or federal definition of "real property" would apply in deciding whether certain federally owned machinery was taxable under a state law which taxed

---

3. Although this article deals with choice of law in the civil context, I think it deals with concepts so fundamental to our federalism that they transcend the civil-criminal distinction.

4. *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

such fixtures as realty. The Court rejected the government's assertion that a more universally accepted definition of realty must obtain, but noted that this was true *only* because the state definition did not impair the purposes of the Act nor work a discrimination against the government.

To saddle the federal government with the state's interpretation would allow the states to eviscerate the Travel Act and frustrate a federal solution to a problem of national scope. As Mishkin notes:

> The extent of incorporation and the techniques for ascertaining what local law is *must be determined by the particular considerations which established the advisability of adopting that law.* Mishkin, at 803. [emphasis added]

It would be self-defeating for the federal government to adopt state notions of illegality only to be bound by state courts which may have considered the law in circumstances which do not present the purposes and considerations surrounding the federal enactment. Such self-defeating intent should not be presumed and will not be found.

The Supreme Court has given the Travel Act this kind of preferential treatment. In *United States v. Nardello, supra,* the District Court dismissed a § 1952 indictment on the grounds that the conduct alleged was not technically extortion in Pennsylvania, the relevant state. The Supreme Court reversed. Because the Travel Act's aim is to combat organized crime operating across state lines, the Act must be construed to equal the task. The Court declined to be bound by the state's definition; it would have nullified the Act. Instead, the Court applied a broader definition of illegal extortion, emphasizing that the essential question is whether the type of activity under prosecution is generally or usually of a type subject to criminal sanctions. *Nardello, supra,* 393 U.S. at 293–6, 89 S.Ct. 534; see, *United States v. Polizzi,* 500 F.2d 856, 873 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United*

States v. Prince, 515 F.2d 564 (5th Cir. 1975), cert. denied, sub nom., Craft, aka Woods, et al. v. United States, 423 U.S. 1032, 96 S.Ct. 563, 46 L.Ed.2d 406 (1975).

The distinction between the view defendants proffer and the approach I adopt is the distinction between applying state law for reasons of state-federal comity and interpreting it to effectuate a far-ranging federal program.

■ The next question is whether there are federal rights implicated when one applies for a Nevada gaming license, and whether without *Rosenthal* the statute abridges them.

The defendants claim first that the right to enter a lawful business is so fundamental its denial should comply with due process. *Cafeteria Workers v. McElroy, supra,* (dealt with plaintiff's right to a due process hearing upon revocation of a security clearance necessary to work at a governmental installation); [5] *Hampton v. Mow Sun Wong, supra,* 426 U.S. at 102, 96 S.Ct. 1895.

This interpretation of "liberty interests" is expounded by Justice Marshall, dissenting in *Massachusetts v. Murgia,* 427 U.S. 307, 322–3, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). However, this view has not received the approval of a majority of the Supreme Court which has limited the scope of Fourteenth Amendment protection in this regard to cases where the foreclosure of opportunities is considerably greater than here. As the Court stated in *Board of Regents v. Roth, supra,* 408 U.S. at 575, 92 S.Ct. at 2708:

> It stretches the concept of liberty too far to suggest that a person is deprived of 'liberty' when [one] simply is not rehired in one job but remains as free as before to seek another.

The defendant Goldfarb is a man of substantial means and abilities. He has numerous opportunities for a variety of occupations before him. The Nevada Gaming Commission's denial was hardly of the mag-

---

**5.** The Court held in the negative, finding the plaintiff was free to look elsewhere for employ-

ment and that merely foreclosing one small field of employment did not implicate liberty.

nitude required to trigger the Fourteenth Amendment.[6]

More troublesome is *Hornsby v. Allen,* 326 F.2d 605 (5th Cir. 1964). There, an unsuccessful liquor license applicant claimed she met all the requirements for a license yet was denied arbitrarily, without a statement of reasons. Noting that merely calling a liquor license a privilege does not exempt the state from the Fourteenth Amendment in its dealings with license applicants, the court held that one who satisfies the requirements for a license is entitled to a due process hearing upon denial thereof. On its face, it seems that *Hornsby* is support for Goldfarb's position although he has not, as yet, shown he meets the requirements for a gaming license (nor does it seem that he could, given the subjective and complex criteria applied by the Nevada state agencies). *Id.,* at 610. However, in *Atlanta v. Allen,* 389 F.2d 713 (5th Cir. 1968), the Fifth Circuit reconsidered *Hornsby* and stated that where the state sets forth specific criteria upon which the decision to grant a license will be based, there arises a due process right to have the agency act only upon those criteria. The court emphasized it does not sit as a super-Liquor Control Board. There has been no showing here that Nevada authorities did not act

upon their published criteria, nor do I sit to review their decision.

I have recently reviewed the *Hornsby* line in connection with a Michigan liquor license applicant's suit charging that the City of Pontiac acted arbitrarily in denying a liquor license. *Shamie v. City of Pontiac,* 443 F.Supp. 679, 684 (E.D.Mich.1977). I held there that the *Hornsby* case should not be followed, reasoning that liquor license applicants have no claim of entitlement under *Roth.* See *Lewis v. City of Grand Rapids,* 356 F.2d 276, 285–6 (6th Cir. 1966); *Medina v. Rudman,* 545 F.2d 244 (1st Cir. 1976), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1976).[7]

Moreover, Nevada has gone to great lengths to deny the kind of claim of entitlement to a gaming license that *Roth* requires of one claiming a protected property interest. Nev.Rev.Stat. § 463.140(2) provides, "The commission shall have full and absolute power and authority to deny any application or to limit, condition, restrict, revoke or suspend any license." Regulation 4.010.1 provides:

> Any gaming license . . . shall be deemed to be a revocable privilege and no person holding such a license . . . is deemed to have acquired any vested rights therein.[8]

---

**6.** The defendant also cites a number of cases which deal with constitutional deprivations which occur when applicants are denied admission to professions. For example, in *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) the Supreme Court held that the New Mexico Board of Bar Examiners had wrongfully denied Schware a license to practice law allegedly because of former communist party affiliations. The Court found a due process violation, not in the abstract nor because of any protected liberty or property interest, but because the criteria applied by the Board were not rationally related to the ends to be served by them and because the criteria impinged upon protected First Amendment rights. No mention of a liberty or property interest in practicing law was made. Therefore, whatever these cases say about entrance requirements and substantive due process, they do not address the question at hand. Moreover, I think that the "legitimate claim of entitlement" of one in the plaintiff Schware's position is considerably stronger than Gold-

farb's, if indeed Goldfarb can be said to have any claim at all in this regard. I think that the other cases defendant cites in this vein may be similarly distinguished. See *Goldsmith v. Board of Tax Appeals,* 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494 (1926); *Shaw v. Hospital Authority,* 507 F.2d 625 (5th Cir. 1975); *Don v. Okmulgee Memorial Hospital,* 443 F.2d 234 (10th Cir. 1971).

**7.** I do not believe the Supreme Court's mention of *Hornsby* in *Goldberg v. Kelly,* 397 U.S. 254, 296, n.9, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) as an example of a situation in which courts had abjured the ancient notion of property interests as rights in a tangible thing amounts to a tacit approval of that case, as Goldfarb contends.

**8.** Regulation 4.010.2 provides:

> An applicant for a state gaming license is seeking the granting of a privilege, and the burden of proving his qualification to receive any license is at all times on the applicant. An applicant must accept any risk of adverse

■ Without deciding the validity of such statutes and regulations, they are nonetheless excellent evidence of the status of a gaming license under Nevada law and practice. They make explicit no applicant should *expect* a license. Property rights—legitimate claims of entitlement—are within the state's authority to create or deny. For example, in *Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1975), the Supreme Court held that the existence of "an enforceable expectation of continued public employment," a property right, was to be determined by whether under state law or custom such an interest existed. Nevada has explicitly disclaimed the interest claimed; its determination is conclusive. For these reasons, I find the Nevada statutes under attack are constitutional. The indictment will not be dismissed on this ground.

However, I also find that even assuming the unconstitutionality of the Nevada statutes in question, the defendants' claim must fail.

■ The overriding federal nature of the Travel Act dictates that an offense thereunder is primarily federal in nature. *United States v. Polizzi, supra,* 500 F.2d at 869 (9th Cir. 1974); *United States v. Prince,* 529 F.2d 1108, 1111–2 (6th Cir. 1976), *cert. denied,* 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976). The gravamen of the offense is the interstate nexus itself. *Polizzi, supra,* at 869. In § 1952 cases the state law serves merely a definitional purpose—there is no need to prove a violation of state law as an essential element of the federal crime. *United States v. Prince,* 515 F.2d 564, 566 (5th Cir. 1975); *United States v. Nardello, supra* ; *United States v. Conway,* 507 F.2d 1047, 1051 (5th Cir. 1975); *but see United States v. Brown,* 505 F.2d 261, 262–3 (4th Cir. 1974). Thus, I do not think the unconstitutionality of the underlying state statute would necessarily be a defense to prosecution under § 1952.

One case has dealt with this question. *United States v. Hiatt,* 527 F.2d 1048 (9th Cir. 1975). There the defendant in a Travel Act prosecution argued that the underlying Alaska prostitution statute was unconstitutional as a denial of equal protection to women and, therefore, he could not be prosecuted. The court stated:

The constitutional infirmity asserted against the Alaska statute was that it denied equal protection of laws to females, as enforced. This defense in the absence of a determination that the Alaska statute was void in its entirety, would not be available to males prosecuted for prostitution. Under these circumstances, it is doubtful that Hiatt can utilize this infirmity to defeat prosecution pursuant to the statutes under which he was here convicted. *Id.,* at 1051.

■ This statement points out, moreover, a crucial feature of a holding of unconstitutionality, had one been secured here. Even if the instant Nevada statute was held violative of the defendants' due process rights, either on its face or in operation, it would not necessarily result in a defense to § 1952. The alleged unconstitutional aspect of the statute has no relationship to the defendant's rights in his posture as a criminal defendant. The statute, in some respects, may be viewed as severable. That is, an improper infringement of a license applicant's due process rights may yet retain sufficient vitality in its criminal prohibitory effect to support a prosecution under the Travel Act, especially given the overriding federal nature of a Travel Act prosecution.

To illustrate, consider a prosecution for violating an obscenity law. If the law is held unconstitutional as an infringement of the defendant's First Amendment rights, that would constitute a defense to the prosecution. Once the unconstitutional portion of the statute is stricken, the statute retains no prohibitory vitality. This is essentially the situation presented in *Shuttlesworth v.*

public notice, embarrassment, criticism, or other action or financial loss which may result from action with respect to an applica-

tion and expressly waive any claim for damages as a result thereof.

*Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Reverend Shuttlesworth was prosecuted for violating an anti-parade ordinance. It was a direct prohibition of his First Amendment rights. Holding the law unconstitutional thus removed the offense completely. Holding the Nevada statutes attacked here unconstitutional in the license-applicant context would not so remove the offense.[9]

 In this case, the alleged unconstitutionality of the Nevada law does not directly concern the defendants' asserted right to engage in gambling activities. It does not proscribe conduct protected under the Constitution. The alleged infirmity is incidental to the defendants' rights. This is a difficult distinction to draw because the rubric "due process" is applied to rights that surface in both civil and criminal contexts. However, the due process rights that apply in the license denial context are distinct from the due process rights which obtain in a criminal context. The fact that Goldfarb may have a 42 U.S.C. § 1983 action against Nevada does not necessarily confer immunity from prosecution.

This conclusion points out that Goldfarb should have tested the constitutionality of the regulation or statute in question before he embarked on a course of violating it—if he did indeed violate it. *See generally*: *McGee v. United States,* 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971); *McKart v. United States,* 395 U.S. 185, 197–202, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Falbo v. United States,* 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 (1943); *Estep v. United States,* 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); *Mulloy v. United States,* 398 U.S. 410, 416, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970); *Witmer v. United States,* 348 U.S. 375, 380–1, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

The defendants stress the absence of a forum in which to *appeal* the Commission's denial. Assuming, *arguendo,* that

this is true, there was nonetheless a judicial forum to *challenge the validity* of the denial. Goldfarb availed himself of it when he filed suit in the 8th Judicial District. If Goldfarb thought the regulations or procedures were faulty, the suit should have been continued to its conclusion. The cases of *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 51–52, 56 S.Ct. 720, 80 L.Ed. 1023 (1936) and *Ohio Valley Water Co. v. Ben Avon Borough,* 253 U.S. 287, 289, 40 S.Ct. 527, 64 L.Ed. 908 (1919) are distinguishable because at stake there were protected constitutional interests.

Having considered defendants' other claims, I find them without merit. The motion to dismiss the indictment is hereby denied.

---

**9.** Consider also *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), where the unconstitutionality of a zoning law on Ninth Amendment and substantive due process grounds precluded conviction thereunder.