GULCH GAMING, INC., Plaintiff,

v.

STATE OF SOUTH DAKOTA; Mark W. Barnett, in his official capacity as Attorney General of South Dakota; Donald Gromer, in his official capacity as Executive Secretary of the South Dakota Commission on Gaming; and Charles Lien, Karen Crew, Karl Fischer, Evans Nord, and Kristi Wagner, in their official capacities as Members of the South Dakota Commission on Gaming.

No. CIV. 91–3023.

United States District Court,
D. South Dakota.

Dec. 20, 1991.

Timothy J. Dougherty, Dougherty & Dougherty, Steven Sanford, Cadwell, Sanford & Deibert, Sioux Falls, S.D., for plaintiff.

Thomas C. Adam, May, Adam, Gerdes & Thompson, Pierre, S.D., for defendant.

Thomas H. Harmon, Tieszen Law Office, Pierre, S.D., for Black Hills Novelty Co., amicus curiae.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### INTRODUCTION

Plaintiff Gulch Gaming, Inc. challenges the constitutionality of a portion of the South Dakota gaming statute. Plaintiff was denied an operator's license to operate slot machines and gaming tables in Deadwood, South Dakota because the majority ownership interest in the corporation is held by nonresidents of South Dakota. The relevant statutory provision requires:

Before any person is licensed as an operator or retailer, he shall show that he is of good moral character, and that he is a bona fide resident and citizen of the state of South Dakota, or if a partnership, corporation, or association shall show that a majority of the ownership interest in the partnership, corporation, or association is held by bona fide residents and citizens of the state of South Dakota.

SDCL 42–7B–25. Two of the three owners of Gulch Gaming, Inc. are Florida residents and the third is a resident of South Dakota.

Each of these individuals owns a one third interest in the corporation.

Plaintiff contends that SDCL 42–7B–25 violates three provisions of the United States Constitution: (1) the Commerce Clause; (2) the Equal Protection guarantee of the Fourteenth Amendment; and (3) the Privileges and Immunities Clause. South Dakota and the South Dakota Commission on Gaming, collectively "South Dakota" or the "State," defend the statute on the grounds that licensed gaming is not a fundamental right and thus enjoys no constitutional protection. Defendant's secondary argument includes the contention that the State of South Dakota has legitimate purposes for the residency requirement that allow the statute to pass constitutional scrutiny. Both plaintiff and defendant filed motions for summary judgment.

### BACKGROUND

In 1986 the people of South Dakota voted to amend the state constitution to allow limited types of gambling in the city of Deadwood, South Dakota. Article III, § 25 provides in part:

[I]t shall be lawful for the Legislature to authorize by law, limited card games and slot machines within the city limits of Deadwood, provided that 60% of the voters of the City of Deadwood approve legislatively authorized card games and slot machines at an election called for such purpose.

S.D. Const. art. III, § 25. The South Dakota legislature then authorized the operation of limited card games and slot machines in Deadwood, SDCL 42–7B–1, and established the South Dakota Commission on Gaming to regulate the gaming activities. SDCL 42–7B–3; SDCL 42–7B–6.

The South Dakota Commission on Gaming is authorized to issue five types of licenses: (1) slot machine manufacturer or distributor licenses; (2) operator licenses; (3) retail licenses; (4) support licenses; and (5) key employee licenses. SDCL 42–7B–22. The majority ownership requirement at issue affects only the operator and retail licenses. Plaintiff's application for an operator's license was denied on the sole ba-

sis of failure to comply with the requirement that a majority of the ownership interest in the corporation be held by South Dakota citizens. Both plaintiff and defendant concede that Gulch Gaming, Inc. was otherwise qualified to hold the license.

## SUMMARY JUDGMENT

The standard for granting judgment as a matter of law is embodied in Rule 56 of the Federal Rules of Civil Procedure. This rule states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, all reasonable inferences drawn from the facts are to be viewed in a light most favorable to the non-moving party. *McCuen v. Polk County*, 893 F.2d 172, 173 (8th Cir.1990). In the instant case, no material facts are in dispute. The parties simply hold differing views regarding the purpose and effect of the statute at issue. Accordingly, this Court will rule on the parties' cross motions for summary judgment by addressing each of plaintiff's contentions separately.

## I. COMMERCE CLAUSE

### A. *Introduction*

Article I, section 8, clause 3 of the United States Constitution, the Commerce Clause, grants Congress the power to regulate commerce among the States.[1] Although explicitly speaking only to Congressional power, the Commerce Clause has also long been interpreted to limit the ability of States to pass legislation that interferes with interstate commerce. Thus the Clause acts as a grant of Congressional power as well as "a restriction on permissible state regulation," even in the absence of Congressional action. *Hughes v. Okla-*

*homa*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978). This limitation on State power is "by no means absolute," as the States retain their general police power to regulate areas of "legitimate local concern" even though such regulation may affect interstate commerce. *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). States may not, however, regardless of the purported purpose, "discriminat[e] against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia v. New Jersey*, 437 U.S. 617, 626–27, 98 S.Ct. 2531, 2536–37, 57 L.Ed.2d 475 (1978). In this way, the Commerce Clause prohibits States from isolating themselves economically and preserves the economic unity of the United States.

When analyzing state legislation under the Commerce Clause, the United States Supreme Court has developed two general standards which differ according to the legislation at issue. Some statutes are facially neutral and have only incidental effects on interstate commerce. The Supreme Court has stated the general rule for such legislation as follows: "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). This balancing test is often referred to as the *Pike* analysis.

A statute that affirmatively discriminates against interstate commerce, on the other hand, is subject to a stricter standard. When "a statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-

---

**1.** The clause reads: "The Congress shall have the Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, sec. 8, cl. 3.

state economic interests, [the Supreme Court has] generally struck down the statute without further inquiry." *Brown–Forman Distillers v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). In many cases "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). At the very least, when the regulation discriminates "either on its face or in practical effect" against interstate commerce, the State bears the burden of showing that the statute "serves a legitimate local purpose" and that the purpose could not be achieved adequately by nondiscriminatory alternatives. *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). This latter, stricter standard is referred to as the *Hughes* test.

**B.** *Whether the Statute Implicates the Commerce Clause*

■ To the extent that the South Dakota statute prohibits corporations owned in part by out-of-state citizens from owning gaming licenses, the statute interferes with the flow of investments across state lines. The State limits access to gaming licenses to those entities, created under South Dakota or other state law, having sufficient South Dakota ownership. This restricts the opportunities nonresidents of South Dakota have to invest their money in businesses owning South Dakota gaming licenses. By granting gaming licenses only to corporations, partnerships, and associations with majority South Dakota ownership, the State statute implicates interstate commerce.[2]

Amicus argues that the South Dakota statute does not affect interstate commerce to an extent sufficient to trigger the constitutional limitations of the Commerce Clause, specifically asserting interstate commerce is not affected by the majority ownership requirement.[3] *See Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 37, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980). In its brief, Amicus contrasts a hypothetical statute requiring gambling equipment be manufactured in South Dakota with the statute at issue requiring majority local ownership in business entities holding gaming licenses. The former, the argument goes, would interfere with interstate commerce while the latter would not. The Commerce Clause, according to this theory, applies only to tangible, not intangible forms of interstate commerce.

The United States Supreme Court has not limited the application of the Commerce Clause to only those state regulations directed at tangible items of commerce. *See, e.g. Lewis*, 447 U.S. 27, 100 S.Ct. 2009 (state statute prohibiting banks, trust companies, and bank holding companies that have their principal place of business outside Florida from owning local investment or trust businesses within Florida violated the Commerce Clause); *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987) (Indiana anti-takeover statute withstood scrutiny under the Commerce Clause "[b]ecause nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors"). The fact that South Dakota has legislated to affect financial investments in certain business entities does not necessarily shield the statute from review under the Commerce Clause.

■ The State strongly asserts the importance of the statute to protect the health and welfare of South Dakota citizens, apparently arguing that because the issuance of gaming licenses is of local concern it is unaffected by the limitations of the Commerce Clause. A finding that gaming is a matter of local concern, however, does not preclude the conclusion that

---

**2.** The statute at issue also requires that individuals who apply for gaming licenses be bona fide South Dakota residents and citizens. That portion of the statute is not before this Court and thus will not be addressed in this opinion.

**3.** This Court granted the motion of Black Hills Novelty Company to file a brief Amicus Curiae in support of defendant's Motion for Summary Judgment.

it also affects interstate commerce. *See Lewis,* 447 U.S. at 38, 100 S.Ct. at 2016 (Supreme Court's acceptance that "banking and related financial activities are of profound local concern" did not mean "that these same activities lack important interstate attributes"). Under the Commerce Clause, the same definition of commerce is used to determine Congress' authority to regulate an activity pursuant to the Clause as is used to prohibit states from interfering with the activity's movement across state lines. *Hughes v. Oklahoma,* 441 U.S. 322, 326 n. 2, 99 S.Ct. 1727, 1731 n. 2, 60 L.Ed.2d 250 (1979). According to the United States Supreme Court, there is no "two-tiered definition of commerce." *Id.* (citing *Philadelphia v. New Jersey,* 437 U.S. 617, 621–23, 98 S.Ct. 2531, 2534–35, 57 L.Ed.2d 475 (1978)). As regards the instant case, Congress has determined that *illegal* gambling "involves widespread use of and has an effect upon interstate commerce" to an extent sufficient to implicate the Commerce Clause. *United States v. Sacco,* 491 F.2d 995, 999 (9th Cir.1974) (citing S.Rep. No. 91–617, 91st Cong., 1st Sess. 16 (1969)). Amicus in fact focuses a significant portion of its argument upon the presence of the federal laws that prohibit the use of wire communication to place bets, receive money for bets, or transmit information to assist the placing of bets in interstate commerce. 18 U.S.C. § 1084(a).

The South Dakota statute concerns *legal* gambling. Yet a case involving an attempt to liberalize gambling laws within the State of Washington has held that "the evidence [present in the case] was sufficient for the jury to find the requisite effect on interstate commerce to satisfy the jurisdictional requirement [under the Hobbs Act]." *United States v. Bagnariol* 665 F.2d 877, 896 (9th Cir.1981) (scheme to liberalize gambling laws and expand gambling activity in the State of Washington was basis for conviction under the Hobbs Act, RICO, and the Travel Act). Although this determination was made in the context of federal statutory law, not the Commerce Clause, a finding that the activities affect interstate commerce was a required element for a violation of these statutes.

This Court recognizes that Congressional regulation in the area of gambling differs in both quality and quantity from Congressional regulation in many areas. *See e.g. Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 38–39, 100 S.Ct. 2009, 2016–17, 64 L.Ed.2d 702 (1980) (Supreme Court lists several examples of federal statutes regulating banking, trust, and investment businesses). Congress has not directly regulated business entities owning gaming licenses in the various states. Yet at the core, legal and illegal gaming involve similar commercial activities. The federal statutory prohibitions, therefore, are relevant to the decision to include gaming licenses in the definition of interstate commerce.

Amicus also asserts that "[t]he amount of gambling that will occur in Deadwood is certainly not affected by the residency of Plaintiff's owners or any other licensees." The gambling itself, however, is not the interstate commerce at issue in this case. South Dakota is not regulating the individual gamblers who come to Deadwood to try their luck at the slot machines. The interstate commerce allegedly affected by this statute, which prohibits certain types of business entities from obtaining a license to operate gaming establishments in South Dakota, is the out-of-state investment in businesses holding South Dakota gaming licenses. Despite well prepared written argument by counsel for defendant and by counsel appearing Amicus Curiae, the Court concludes that the statute at issue does implicate the Commerce Clause of the United States Constitution.

C. *The Analysis under the Commerce Clause*

▆▆▆ The Supreme Court in *Hughes* summarized the general rule for determining whether a statute's burden on interstate commerce is permissible under the Commerce Clause. The rule requires a court to ask:

(1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate com-

merce either on its face or in practical effect;

(2) whether the statute serves a legitimate local purpose; and, if so,

(3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). This articulation of the rule embodies both standards developed by the Supreme Court. If the effect of the statute on interstate commerce is only incidental, and

> [i]f a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, on whether it could be promoted as well with a lesser impact on interstate activity.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). If the effect is direct, the burden shifts to the State to justify the statute in terms of both its purpose and the lack of alternative means. *Hughes v. Oklahoma,* 441 U.S. at 336, 99 S.Ct. at 1736.

▆▆▆ The distinction between state legislation that affirmatively discriminates against interstate commerce and legislation that has only incidental effects is not always a clear one. *See Brown–Forman Distillers v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). The South Dakota statute does not ban all business entities owned in any part by out-of-state investors from obtaining gaming licenses. Only those entities whose majority ownership is held by nonresidents of the State of South Dakota are prohibited from obtaining a gaming operator or retailer license. Furthermore, the majority ownership requirement applies to all business entities

regardless of the origin of the entity itself. Nevertheless, the discrimination is direct, focusing on corporations, partnerships, and associations that have too much out-of-state ownership. The South Dakota statute discriminates among business entities on the basis of the residency of their investors. *See Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 42, 100 S.Ct. 2009, 2018, 64 L.Ed.2d 702 (1980).[4] The discrimination, therefore, is not evenhanded for purposes of the Commerce Clause. *See id.*

▆▆▆ Under the stricter *Hughes* test, the State must show both that the statute serves a legitimate local interest and that there exist no less discriminatory means to achieve that interest. This Court finds that the South Dakota statute directly burdens interstate commerce, thus invoking the standard that puts this burden on the State. Yet even under the more deferential *Pike* analysis the statute must be shown to serve a legitimate local purpose. The purposes South Dakota offers for the residency requirement fall within the realm of a State's police powers. A State is well within its authority "to protect the public health, safety, morals, good order, and the general welfare of the inhabitants of the state." SDCL 42–7B–2.1(3). South Dakota also asserts that further purposes of the residency requirement are to:

(a) preserve the unfettered jurisdiction of the State of South Dakota over persons and entities that hold privileged gaming licenses;

(b) insure regulatory control of the persons and entities operating gaming establishments;

(c) maintain immediate access to data, documents and information in the possession and control of licensees within this state;

(d) to maintain daily oversight capabilities of the activities and associations of licensees; and

---

4. There also seems to be a greater likelihood that a business entity owned in the majority by out-of-state investors would be an out-of-state rather than in-state entity; or, conversely, that an out-of-state entity would be of the type denied a license on the basis of majority out-of-state ownership. To the extent that these specu-

lations are true, the contention that the statute interferes with interstate commerce is further strengthened: out-of-state business entities would more often be denied the opportunity to conduct business within the borders of South Dakota than their in-state counterparts.

(e) avoid any difficulties in collection and enforcement of the tax obligations of gaming licenses.

Defendant's Memorandum in Support of its Motion for Summary Judgment, and in Opposition to Plaintiff's Motion for Summary Judgment or for Preliminary Injunction at 6–7. This Court does not dispute the legitimacy of a State's efforts to maintain tight regulatory control over an industry illegal in many states and restricted in scope and geographical location within its own borders.

Plaintiff disagrees that the statute was enacted to protect the health and welfare of South Dakota residents and to retain regulatory control. Instead, plaintiff contends the ownership requirement is a means to protect the economic interests of South Dakota citizens. South Dakota's statute, plaintiff continues, should be struck down as a per se violation of the Commerce Clause because it facially and outrightly bars business entities with majority out-of-state ownership from obtaining gaming licenses. The Supreme Court has asserted that the "evil of protectionism can reside in legislative means as well as legislative ends." *Philadelphia v. New Jersey,* 437 U.S. 617, 626, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475 (1978). Thus, even if South Dakota had legitimate goals in mind when enacting the statute at issue, South Dakota cannot use unnecessarily discriminatory means to achieve what would be otherwise legitimate ends.

This Court accepts South Dakota's contention that it enacted the statutory provision at issue with the intent to protect the health and welfare of its citizens and to retain tight regulatory control over the industry. The majority ownership requirement nevertheless must not excessively burden interstate commerce. Under the *Hughes* test the State also bears the burden of showing there are no less discriminatory means to achieve these goals. Even under the more deferential *Pike* analysis, the benefits sought from the South Dakota statute must not be outweighed by an excessive burden on interstate commerce.

South Dakota contends that because the Commission on Gaming has been in existence only approximately two years, it is necessarily in a period of experimentation. As a result, the State cannot affirmatively link the troubles the Commission seeks to avoid with the majority ownership requirement. Defendant argues that the Commission faces "many unknowns in the industry" and that "the actual problems encountered by the Commission so far are not necessarily accurate indicators of the problems of the gaming industry in South Dakota as a whole." Apparently, the regulations are preventive measures to avoid potential problems.

While South Dakota justifies the statute partially on the basis of inexperience in the field of gaming regulation, the State also relies heavily upon the fact that the State of Nevada, which has had legalized gambling for a much longer period of time, has a similar requirement. Yet no evidence has been offered suggesting that the more experienced gambling States, much less South Dakota, have encountered difficulties that justify the differential treatment of business entities based upon the residency of the majority of the interest holders. Furthermore, no evidence links such entities to the threats that the State fears. The State has not supported its allegation that these suspect businesses instill a greater distrust on the part of South Dakota citizens than do businesses owned in the majority by local investors, or the allegation that businesses owned in the majority by nonresidents are more likely to violate the gaming regulations, with even speculative rationale.

Plaintiff analyzes several of the State's justifications in light of the affidavit and deposition given by Donald Gromer, Commissioner of the South Dakota Commission on Gaming. Gromer stated that nonresidents may be difficult to locate for notice and pleadings purposes. The interest in preserving jurisdiction of the State over persons and entities holding gaming licenses, as asserted by the State, could well be satisfied by requiring the entity applying for a license to identify an in-state agent for service of process. The corporation,

not the shareholders, owns the gaming license. Service of process on the individual shareholders is not service of process on a corporation. A partnership is also conceptually distinct from its individual partners or investors. Even if the majority ownership requirement guaranteed the State of South Dakota jurisdiction over investors, the goal of maintaining "unfettered jurisdiction" over gaming license holders would not necessarily be met.

The State also desires to maintain regulatory control over the persons and entities that operate gaming establishments. Gromer indicated that nonresidents of South Dakota may have less respect for state law and require more out-of-state investigation. A board of directors, not the shareholders, is responsible for decision-making in a corporation. The residency composition of the shareholders does not necessarily dictate the residency of the members of the board. A partnership is ordinarily managed according to the by-laws of the individual partnership, with management arrangements as diverse as the partnerships themselves. Defining an acceptable level of out-of-state ownership, therefore, does not necessarily facilitate the State's desire to maintain regulatory control over corporate and partnership licensees.

The State also asserts an interest in maintaining immediate access to the books and documents of licensees. The corporation or partnership holds this information, not the investors whose residency the statute dictates. Further, the State does not require business entities holding gaming licenses to keep such information within the State. A foreign corporation doing business in South Dakota, even with majority ownership held by South Dakota residents, could lawfully keep its books and records outside of South Dakota. The State also expresses an interest in maintaining daily oversight of the activities of licensees. The gaming establishments all exist within the city limits of Deadwood, South Dakota. To the extent that the daily

oversight is of the establishments themselves, majority local ownership of the business has no bearing upon the State's ability to investigate the activities at the gaming operations. If the daily oversight is to be of the investors, the State has not explained how such oversight would be conducted or why such oversight is necessary.[5]

Finally, the State argues that it intends to avoid difficulty in tax collection by requiring majority local ownership. Once again, the corporation, not the shareholders, pays the corporate taxes. A partnership files a tax return separate from its individual partners. Requiring investors to be South Dakota residents to ensure payment of a corporate or partnership tax does not meet the ends intended.

### D. Conclusion

The State of South Dakota has asserted legitimate local interests in enacting SDCL 42–7B–25, the majority residency requirement. South Dakota has not shown, however, that equally effective, but less discriminatory means do not exist to achieve these legitimate purposes. Further, the burden on interstate commerce that this statutory provision exerts outweighs the potential benefits, if any, that may result. Accordingly, the statutory provision requiring corporations, partnerships, and associations applying for a gaming license to be owned in the majority by bona fide residents and citizens of South Dakota passes neither the more deferential *Pike* analysis nor the stricter *Hughes* test. SDCL 42–7B–25 places an impermissible burden on interstate commerce and thus violates the United States Constitution.

### II.  EQUAL PROTECTION

■  Plaintiff also alleges a violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiff argues that the State is attempting to protect local economic interests, which is not a legit-

---

5. Furthermore, investors holding five percent or more ownership interest in a corporation, partnership, or association applying for a gaming license already must meet the character and integrity requirements of SDCL 42–7B–33.

imate state purpose under the Equal Protection guarantee of the United States Constitution. South Dakota, on the other hand, asserts that the majority ownership requirement is a rational means of maintaining control of an industry that has the potential to attract "social evils."[6]

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws," a mandate that all similarly situated persons be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The Supreme Court has stated that in determining the validity of a statute for Equal Protection purposes "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classifica-

tion drawn by the statute is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Courts assume, particularly with respect to social or economic regulation, that the democratic process will successfully remedy any unwise legislative decision. *Id.*

■■■■ Under Equal Protection analysis, statutes that disproportionately affect a suspect class[7] or infringe upon a fundamental right must pass what courts have termed "strict scrutiny." *See Plyler*, 457 U.S. at 216–17, 102 S.Ct. at 2394–95; *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. Under this standard, the State must show that the statutory classification at issue is

---

**6.** Defendant South Dakota also bases a significant portion of its argument on the idea that because gaming is "suspect" in our society and the legislature affirmatively denied the creation of any property right in a gaming license, gaming licenses are therefore "privileges," not fundamental rights, and correspondingly enjoy no constitutional protection. The presence or absence of a fundamental right may affect the constitutional analysis applied by a court. This Court does not agree, however, that if a license to operate a gaming establishment is not a fundamental right the issuance of that license stands independent of any limitations imposed by the federal Constitution.

Defendant also relies heavily upon a group of cases that apparently suggest the federal Constitution does not apply to gaming. *Kraft v. Jacka*, 669 F.Supp. 333 (D.Nev.1987) (no constitutional right to receive a Nevada gaming license); *Medina v. Rudman*, 545 F.2d 244 (1st Cir.1976) (because an ownership interest in greyhound racetrack is neither a fundamental right nor a right recognized under state law, full constitutional due process protections do not apply); *U.S. v. Goldfarb*, 464 F.Supp. 565 (E.D.Mich. 1979) (Nevada gaming license not a property right that implicates due process); *Thomas v. Bible*, 694 F.Supp. 750, 760 (D.Nev.1988), aff'd 896 F.2d 555 (9th Cir.1990) (held that candidate for "List" excluding persons from Nevada casinos was not denied procedural due process). Defendant's reliance upon this line of cases is misplaced. In these cases the plaintiffs argued affirmative constitutional rights to, and associated with, gaming licenses or ownership in a racetrack. In the instant case, plaintiff alleges that the statute violates the distribution of power between a State and the federal governments as dictated by the Commerce Clause, and violates the guarantee that "all persons similarly circumstanced shall be treated alike" as provid-

ed by the Equal Protection Clause. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)). A gaming license, or even gaming itself, may not be a constitutionally protected right. Recognition of this fact, however, does not mandate the conclusion that the United States Constitution never applies to any situation in which gaming is involved.

**7.** Under Equal Protection analysis certain classifications are considered inherently suspect. The Supreme Court has determined that statutory classifications based on race, alienage, or national origin are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. These suspect classifications are "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective." *Plyler*, 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14. A "suspect class," burdened with a history of prejudice and discrimination, is often powerless to instigate change in the majoritarian political process. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973); *see U.S. v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234 (1938). Accordingly, the Equal Protection Clause protects "groups disfavored by virtue of circumstances beyond their control" from unequal legislative treatment. *Plyler*, 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14. Appropriately, neither plaintiff Gulch Gaming, Inc. nor defendant South Dakota alleges that the statute at issue in the instant case disadvantages a "suspect class."

"precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 217, 102 S.Ct. at 2395.

This Court does not dispute defendant's contention that a gaming license is not a fundamental right the United States Constitution guarantees to the American people. The United States Supreme Court has limited the bestowal of "fundamental right" status to a very few activities, including the right to travel, *see Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the right to vote, *see Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and the right to make certain intimate personal decisions concerning marriage and procreation, *see Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).[8] As acquisition of a gaming license is not to be included in this group, this Court must apply the rational relation standard to the South Dakota statute at issue, a standard significantly more deferential to a state's legislative decisions.

To survive an Equal Protection challenge, the South Dakota statute must be rationally related to a legitimate governmental interest. On cross motions for summary judgment, this Court accepts the State's asserted goals as legitimate. The inquiry then focuses upon whether the statute, requiring a majority ownership interest in business entities applying for gaming licenses be held by South Dakota citizens, is rationally related to these legitimate goals.

Legislatures have fairly wide discretion to address perceived problems within the state, to make rational distinctions "with substantially less than mathematical exactitude," and to implement a regulatory program "step by step." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976); *see Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The Supreme Court has recognized that in defending a statute a "State is not compelled to verify logical assumptions with statistical evidence." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976). A statute is not unconstitutional merely because the State "might have furthered its underlying purpose more artfully, more directly, or more completely." *Id.*

While a State is given significant latitude to legislate its local economy, a statute must nevertheless meet the minimum rationality requirement. *See, e.g. Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (New Mexico's distinction between two classes of resident veterans bore no rational relationship to State's asserted goals); *see also Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) ("A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation....'") (citation omitted). The distinction South Dakota has drawn between business entities with majority South Dakota ownership and entities with majority out-of-state ownership does not meet this minimal test. The statute bears no rational relationship to the goal of protecting the health, safety, morals, good order, and general welfare of the inhabitants of the State of South Dakota. Any person owning five percent or more of a corporation, partnership, or association applying for a gaming license already must meet certain standards for character, honesty, and morality. SDCL 42–7B–33. And the individual's "prior activities, criminal record, reputation, habits and associations" shall be such that they pose no threat "to the public interests of this state or to the

8. Defendant's contention that a gaming license is not a fundamental right also has relevance under the Privileges and Immunities Clause, although the word "fundamental" takes on a different connotation in this context. The Privileges and Immunities Clause protects citizens of the several States from infringement of those privileges and immunities that are fundamental

to the nation as a whole. *See Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978) ("[o]nly those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity" are entitled to protection under the Privileges and Immunities Clause).

control of the gaming." *Id.* The additional requirement that the investors holding a majority ownership interest be South Dakota citizens does not further the goal of preventing potentially illegal or dangerous activity from occurring within the gaming industry. The State has offered no evidence to suggest that out-of-state owners, when they individually or collectively own a majority of a business, are more likely to threaten the integrity of the gaming industry than their in-state counterparts.

South Dakota's majority ownership statute also bears no rational relationship to the goal of maintaining regulatory control over gaming licensees. The specific purposes asserted by Commissioner Gromer, as previously analyzed under the Commerce Clause claim, are not met by the majority ownership requirement. The interests in preserving jurisdiction over the licensees, in maintaining control over entities that operate gaming establishments, in ensuring immediate access to books and records, in maintaining daily oversight of the activities of the licensees, and in avoiding difficulty in tax collection are not met by dictating the residency of the gaming operation's investors.

The State of South Dakota has wide discretion to regulate the gaming industry within its borders. Furthermore, the goals the State has asserted in justification of the statute at issue are legitimate governmental purposes. The Equal Protection guarantee of the Fourteenth Amendment simply requires that the means the State chooses be rationally related to the desired ends. Because the State of South Dakota has not chosen statutory means that bear a rational relation to its legitimate State goals, the majority ownership requirement at issue in the instant case violates the Equal Protection Clause of the Fourteenth Amendment.

## III. PRIVILEGES AND IMMUNITIES

██ Plaintiff's third claim alleges that the South Dakota statute violates Article IV, § 2, cl.1 of the United States Constitution, the Privileges and Immunities Clause. The Privileges and Immunities Clause reads: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Plaintiff Gulch Gaming, Inc. is a South Dakota corporation. While corporations are considered citizens for many purposes, they are not "Citizens" within the meaning of the Privileges and Immunities Clause. *See Western & S.L.I. Co. v. Bd. of Equalization,* 451 U.S. 648, 656, 101 S.Ct. 2070, 2076–77, 68 L.Ed.2d 514 (1981); *Reeves v. Kelley,* 586 F.2d 1230, 1232 n. 2 (8th Cir. 1978) (citing *Asbury Hosp. v. Cass County,* 326 U.S. 207, 210–11, 66 S.Ct. 61, 63, 90 L.Ed. 6 (1945); *Paul v. Virginia,* 75 U.S. (8 Wall) 168, 177, 19 L.Ed. 357 (1868)). As the Privileges and Immunities Clause is inapplicable to corporations, that portion of plaintiff's claim is dismissed as a matter of law.[9]

---

9. Amicus argues, in another context, that in bringing this suit Plaintiff Gulch Gaming, Inc. is merely asserting the rights of its nonresident shareholders. Plaintiff denies this contention.

The Court agrees with plaintiff: Gulch Gaming, Inc., not individual shareholders, is the plaintiff in the instant suit.